UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AI XIONG,

               Plaintiff,

    v.

KILOLO KIJAKAZI, acting
Commissioner of Social Security,

             Defendant.

No. 1:21-cv-00134-GSA

**ORDER DIRECTING ENTRY OF
JUDGMENT IN FAVOR OF PLAINTIFF
AND AGAINST DEFENDANT
COMMISSIONER OF SOCIAL SECURITY**

**(Doc. 16)**

## I.    Introduction

Plaintiff Ai Xiong ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her applications for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act. The matter is before the Court on the parties' briefs which were submitted without oral argument to the United States Magistrate Judge.[1] *See* Docs. 16, 17. After reviewing the record the Court finds that substantial evidence and applicable law do not support the ALJ's decision. Plaintiff's appeal is therefore granted.

## II.    Factual and Procedural Background[2]

On April 18, 2018 Plaintiff applied for disability insurance benefits and supplemental security income alleging disability as of November 23, 2015. AR 423. The Commissioner denied the applications initially and on reconsideration. Plaintiff requested a hearing which was held before an Administrative Law Judge (the "ALJ") on September 2, 2020. AR 35–59. On October 6, 2020 the ALJ issued a decision denying Plaintiff's application. AR 11–34. The Appeals Council denied review on December 4, 2020. AR 2–7. On February 1, 2021 Plaintiff filed a complaint in

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge. *See* Docs. 8 and 10.
[2] The Court has reviewed the relevant portions of the administrative record including the medical, opinion and testimonial evidence about which the parties are well informed, which will not be exhaustively summarized. Relevant portions thereof will be referenced in the course of the analysis below when relevant to the parties' arguments.

1  this Court.  Doc. 1.

2      III.   **The Disability Standard**

3          Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

4  Commissioner denying a claimant disability benefits.  "This court may set aside the

5  Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal

6  error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180

7  F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the

8  record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See*

9  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a

10  preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

11          When performing this analysis, the court must "consider the entire record as a whole and

12  may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social*

13  *Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).  If the

14  evidence could reasonably support two conclusions, the court "may not substitute its judgment for

15  that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066

16  (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless

17  error, which exists when it is clear from the record that the ALJ's error was inconsequential to the

18  ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

19
20          To qualify for benefits under the Social Security Act, a plaintiff must establish that
     he or she is unable to engage in substantial gainful activity due to a medically
21     determinable physical or mental impairment that has lasted or can be expected to
     last for a continuous period of not less than twelve months.  42 U.S.C. §
22     1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . .
     his physical or mental impairment or impairments are of such severity that he is not
23     only unable to do his previous work, but cannot, considering his age, education, and
     work experience, engage in any other kind of substantial gainful work which exists
24     in the national economy, regardless of whether such work exists in the immediate
     area in which he lives, or whether a specific job vacancy exists for him, or whether
25     he would be hired if he applied for work.

26  42 U.S.C. §1382c(a)(3)(B).

27          To achieve uniformity in the decision-making process, the Commissioner has established a

28  sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-

(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff  bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

### IV.    The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of November 23, 2015.  AR 17.  At step two the ALJ found that Plaintiff had the following severe impairments: hearing loss, vision loss, post-traumatic stress disorder (PTSD), depression, anxiety, and panic disorder.  AR 17.  The ALJ also determined at step two that Plaintiff had the following non-severe impairments: degenerative disc disease, degenerative joint disease, hypertension, and dermatitis.  AR 17.  At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 17.

Prior to step four, the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following limitations: must wear eye glasses, cannot work in an environment louder than a typical office or retail environment, cannot work in an environment that requires more than occasional communication with others, can perform simple and repetitive tasks, and can engage in routine work related decision making.  AR 18–23.

At step four the ALJ concluded that Plaintiff could perform her past relevant work as an

industrial cleaner.  AR 23.  The ALJ provided an alternative finding at step five, in reliance on the VE's testimony, concluding that Plaintiff could perform other jobs existing in significant numbers in the national economy, namely: hand packager, "cleaner housekeeping," and assembler.  AR 24. Accordingly, the ALJ concluded that Plaintiff was not disabled at any time since her alleged onset date of November 23, 2015.  AR 25.

## V.  **Issues Presented**

Plaintiff asserts four claims of error: 1) that the matter should be remanded for further proceedings in light of the February 2021 finding of disability on her subsequent claim, which she contends constitutes new and material evidence which reasonably could have affected the outcome of the prior decision; 2) that the ALJ failed to include the established impairment of migraine headaches; 3) that the ALJ improperly rejected the opinion of the treating psychiatrist; and 4) that the ALJ's rationale regarding an examining physician is fatally flawed.  Br. at 1–2,  Doc. 16.

### A.  **The February 2021 Favorable Disability Determination**

Following the denial of Plaintiff's current application for benefits on October 6, 2020, she filed a subsequent application which was approved with a disability onset date of February 17, 2021.  Plaintiff argues remand is appropriate here based on the Ninth Circuit's decision in *Luna*.

The District Court in *Luna* provided a succinct and informative summary of the relevant law regarding the extent to which a subsequent grant of disability benefits in close proximity to a previous denial constitutes new and material evidence justifying reopening the denied application for further consideration pursuant to sentence six of 42 U.S.C. 405(g):

> Pursuant to 42 U.S.C. § 405(g), "remand is warranted only if there is new evidence that is material and good cause for the late submission of the evidence." *Bruton v. Massanari*, 268 F.3d 824, 827 (9th Cir.2001). New evidence is material if it "bear[s] directly and substantially on the matter in dispute," and if there is a "reasonabl[e] possibility that the new evidence would have changed the outcome of the ... determination." *See id.* (quoting *Booz v. Sec'y of Health & Human Servs*., 734 F.2d 1378, 1380 (9th Cir.1984)).
>
> . . .
>
> Where a second social security application finds a disability commencing at or near

4

the time a decision on a previous application found no such disability, the subsequent finding may constitute new and material evidence. *See, e.g., Reichard v. Barnhart*, 285 F.Supp.2d 728, 734 (S.D.W.Va.2003) (holding that an ALJ's decision finding disability commencing less than a week after claimant was found not disabled is new and material evidence).

Such evidence is not necessarily preclusive[3] of disability as the application may involve different medical evidence, different time periods, and a different age classification. *See Bruton*, 268 F.3d at 827. When a disability, however, *is found upon subsequent applications on substantially the same evidentiary background as was considered with respect to prior applications* without such occurrences, ... the disability onset date might reasonably be sometime prior to the ALJ's decision [with respect to] the prior applications in view of a subsequent finding of disability." *Reichard*, 285 F.Supp.2d at 736 n. 9.

The Court does not have the records and, thus, cannot determine if the evidence adduced in the second application consisted of substantially similar evidence or if there were substantial changes in Plaintiff's physical and/or mental condition subsequent to the denial of benefits. Nevertheless, it is clear that while the instant denial of benefits was under review, Plaintiff filed a subsequent application for benefits which was granted—indicating an onset date one day after the initial denial. This finding certainly warrants further consideration as to whether Plaintiff was actually disabled during the period of time relevant to Plaintiff's first application. Furthermore, the Court finds that there is at least a reasonable possibility that evidence supporting disability with an onset date one day removed may be persuasive in changing the outcome in this case. Thus, the Court finds that the subsequent finding of disability constitutes new and material evidence.

*Luna v. Astrue*, No. CIV 07-719-PHX-MHB, 2008 WL 2559400, at *2 (D. Ariz. June 23, 2008), aff'd, 623 F.3d 1032 (9th Cir. 2010).

The Commissioner in *Luna* sought voluntary remand to the Appeals Council to reconcile the favorable and unfavorable disability determinations, though the Commissioner and the plaintiff could not agree to the terms of remand necessitating the filing of the Commissioner's motion which the Court granted. *Id.* The plaintiff appealed arguing that remand for payment of benefits was the appropriate remedy, not remand for further proceedings. *Luna v. Astrue*, 623 F.3d 1032, 1033 (9th Cir. 2010). The Ninth Circuit affirmed holding that the District Court did not err in remanding for further proceedings to reconcile the favorable and unfavorable disability determinations as opposed

---

[3] This appears to be a typo, as the word "conclusive" makes much more sense given the context.

to remanding for benefit payment. *Id.*

In short, *Luna* does not establish a per se rule that a subsequent grant of benefits in close proximity to a previous denial justifies reopening the prior case. Here, Plaintiff relies only on the temporal proximity of the two disability determinations to establish the similarity between this case and *Luna*. In response, Defendant underscores that the only issue in *Luna* was remedy, the Commissioner having conceded that remand was warranted to reconcile the two decisions. Here, the Commissioner does not so concede.

Plaintiff also states that, in the time period between the two determinations, "to the best of Plaintiff's knowledge no material facts changed." Br. at 9. In response, Defendant offered the following explanation:

> Here, the agency subsequently found Plaintiff disabled as of February 2021, her SSI filing date, based on hearing loss at the listing level, specifically Listing 2.10A4 (Exh. B, Disability Determination Explanation, pg. 14). December 2018 (AR 17). Following Plaintiff's subsequent application, the agency gathered additional information on Plaintiff's hearing by ordering an audiology consultative examination because she had not undergone any recent testing (Exh. B, pg. 7). The audiogram, dated August 2021, showed no hearing in Plaintiff's right ear, and profound hearing loss in her left ear (Exh. B, pg. 12; *see also* Exh. B, pg. 8 ("Rt ear is non functional" and "Clt primarily has [conductive hearing loss] in the left ear [with] a component of [sensorineural hearing loss]. The values are credible"). Based on the evidence of hearing loss, the agency found Plaintiff disabled. During the period at issue in the ALJ's decision, the record showed that Plaintiff had sensorineural hearing loss but was able to hear at close distances without hearing aids (AR 939, 1001). The evidence, therefore, showed that Plaintiff experienced deterioration in her hearing following the ALJ's decision.

Resp. at 16–17, Doc. 9.

Plaintiff's subsequent audiogram establishing listing level hearing loss provides a facially legitimate reason to distinguish her second application from her first. The unfavorable determination on her first application was founded on a distinct evidentiary basis showing some hearing loss but the ability to hear at close distances without hearing aids.

Though neither party makes this observation, the Court notes that the audiogram establishing listing level hearing loss based on listing 2.10 was dated August 11, 2021, though the agency assessed an onset date several months earlier as of February 17, 2021.  Doc. 17-2 at 13, 22.  Thus, it is theoretically conceivable that the actual date of onset was even earlier than that, perhaps sometime prior to the date of the ALJ's unfavorable decision in this case on October 6, 2020.  The Court cannot find that this is a reasonable possibility, however.

Plaintiff compares this case to *Luna* by relying solely on the temporal proximity of the two *decisions*, with no discussion of the evidence upon which the second decision was founded (the August 2021 audiogram).  In *Luna*, the subsequent favorable determination established disability with an onset date *one day* after the date of the prior unfavorable decision, whereas here they were several months removed.  *Luna*, No. CIV 07-719-PHX-MHB, 2008 WL 2559400, at *2.

Moreover, there is no indication as to why the disability onset date assessed in Plaintiff's subsequent application here was 6 months earlier than the date of the audiogram establishing the hearing loss.  It would be speculative to suggest the actual onset date was several months earlier than that.  That is particularly true where, as here, Plaintiff's posits no theory on the impact of the August 2021 audiogram, nor did she cite, attach or acknowledge the same in her opening brief.  Further, after Defendant did so in response, Plaintiff provided no reply.

In short, the Court cannot entirely foreclose the possibility here that a close inspection of the record would reveal some reason to believe Plaintiff's hearing loss occurred prior to October 6, 2020.  However, Plaintiff did not meet her burden on this point and the Court will not advance such an argument on her behalf.  Based on the parties' briefing here, and the evidence cited therein, there is no reasonable possibility here that the second disability determination dated February 17, 2021, or the evidence upon which it was founded (the August 11, 2021 audiogram), would affect the outcome of the first determination.

**B.**     **Failure to Include Migraine Headaches as an Impairment**

**1.**     **Applicable Law**

At step two of the five-step process, plaintiff has the burden to provide evidence of a medically determinable physical or mental impairment that is severe and that has lasted or can be expected to last for a continuous period of at least twelve months. *Ukolov v. Barnhart*, 420 F.3d 1002, 1004–05 (9th Cir. 2005) (*citing* 42 U.S.C. § 423(d)(1)(A)). A medically determinable physical or mental impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," and will not be found based solely on the claimant's statement of symptoms, a diagnosis or a medical opinion. 20 C.F.R. § 404.1521.

Step two is "a de minimis screening device [used] to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). A "severe" impairment or combination of impairments is one that significantly limits physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520. An impairment or combination of impairments should be found to be "non-severe" only when the evidence establishes merely a slight abnormality that has no more than a minimal effect on an individual's physical or mental ability to do basic work activities. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005); 20 C.F.R. §§ 404.1522, 416.922. "Basic work activities" mean the abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, and mental functions such as the ability to understand, carry out, and remember simple instructions, deal with changes in a routine work setting, use judgment, and respond appropriately to supervisors, coworkers, and usual work situations. 20 C.F.R. § 404.1522, 416.922.

When reviewing an ALJ's findings at step two the Court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant]

did not have a medically severe impairment or combination of impairments."  *Webb*, 433 F.3d at

687 (citing *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988) ("Despite the deference usually

accorded to the Secretary's application of regulations, numerous appellate courts have imposed a

narrow construction upon the severity regulation applied here.")).

## 2.      **Analysis**

As Plaintiff observes, the ALJ did not make an explicit finding as to whether Plaintiff's

headaches were severe or non-severe.  Contrary to Plaintiff's contention, however, the ALJ did

discuss the impairment.  The ALJ noted that Plaintiff identified headache pain and dizziness among

her allegedly disabling impairments.  AR 19 (citing Exhibit B19E, AR 569–77).  The ALJ noted

that Plaintiff reported headaches to the consultative examiner, Dr. Stoltz, on April 22, 2017 whose

diagnostic impression include chronic tension headaches.  AR 21 (citing Exhibit B6F, AR 695–

703).  The ALJ noted that the second consultative examination with Dr. Stoltz on June 4, 2018 also

noted chronic headaches among the diagnostic impressions.  AR 22 (citing Exhibit B13F, AR 890–

896).

Plaintiff cites additional records establishing the diagnosis and purportedly also establishing

work related limitations which she contends the ALJ harmfully erred in ignoring:

> In the instant matter, Plaintiff maintains that the medical evidence and other evidence
> establish not only the diagnosis, but also significant work restrictions resulting from
> chronic headaches. The medical records demonstrate regular reports of debilitating
> migraine headaches. Ar. 657, 681, 695, 719, 739, 840, 892, 897, 927, 928, 1023.
> Plaintiff reported to her physician that headaches are recurrent, intermittent and aching;
> that headaches are associated with dizziness and loss of balance; and that she realized
> moderate relief if she lays down in a darkened room. Ar. 657. Her treating psychiatrist
> opined that headaches are an exacerbating factor of Plaintiff's mental health
> impairments. Ar. 738, 974, 977. Plaintiff also reported in a headache questionnaire that
> headaches are caused by thinking or seeing things and that she has a constant burning
> and knocking pain. Ar. 567. There is no medical finding anywhere in the record to refute
> the diagnosis. As to the limiting effects of the impairment, evidence establishes that
> chronic headache pain would reasonably result in off task behavior. For example,
> Plaintiff noted that headaches were so severe that she had to lay down in a darkened
> room. Ar. 657. Accordingly, for the period of time Ms. Xiong is experiencing a
> headache and needs to lay down, she would be unable to attend to work duties. In light

9

of these facts, Plaintiff maintains that chronic headaches are a severe impairment that should have been considered by the ALJ. The fact that the ALJ did not consider this impairment constitutes reversible error.

. . .

Plaintiff asserts that had the ALJ properly considered all of her impairments he would have found that the Plaintiff's RFC contained greater restrictions. For instance, had the ALJ considered the need to lay down in a darkened room or the exacerbating effects of headaches on the underlying mental health impairments, he would have found that Plaintiff would be off task in excess of the tolerances to which the VE testified. Ar. 56.

First, in addition to the records cited by the ALJ, Plaintiff's underscores other records establishing the diagnosis and establishing that Plaintiff reported headaches to her physicians. Although the ALJ did not cite each of those records, the ALJ demonstrated awareness of the diagnosis as described above.  The ALJ need not cite each record discussing the impairment. *Vincent ex rel. v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (an ALJ "need not discuss all evidence presented . . ."). Moreover, "[t]he mere existence of an impairment is insufficient proof of a disability" because the "claimant bears the burden of proving that an impairment is disabling." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).

Plaintiff then cites page 657 of the record on three occasions to establish three progressively stronger propositions: 1) that Plaintiff realized moderate relief by laying in a dark room, 2) that Plaintiff must lay in a dark room to realize relief, and 3) that Plaintiff's need to lay in a dark room would result in off task behavior in excess of the tolerances to which the VE testified.  Only the first statement is supported by page 657, namely that she realized moderate relief by laying in a dark room.  This does not establish that no other measures would alleviate the pain, that the pain was sufficiently severe that it required alleviation to be able to work, how frequently the headaches occurred, or how long Plaintiff would be incapacitated when they did occur.  In short, even if Plaintiff's statements in page 657 were accepted as true, those statements would not establish that she would be off task in excess of the tolerances testified to by the VE.

Plaintiff also cites the headache questionnaire in which she indicated the headaches are triggered by thinking and seeing things, and the pain is constant, burning and knocking.  Br. at 11 (citing AR 567).  Page 657, by contrast, described the pain as intermittent and aching, and noted that "nothing aggravates the symptoms."  Of course, some variation in the presentation of symptoms is entirely reasonable.  But these examples are illustrative of the inherent difficulty in constructing concrete work restrictions from an amalgamation of Plaintiff's subjective descriptions of her pain, as Plaintiff attempts to do here.  Those reports don't necessarily paint a consistent picture of the pain symptoms, and they leave many questions unanswered.

The headache questionnaire also noted the headaches occurred daily.  AR 567.  When asked to provide the date of her last four headaches, she identified four days in an eight day period between August 27 and September 3, 2018.  AR 567.  She indicated they last one to two hours or more, that she takes ranitidine and ibuprofen for pain, and that the medication works "not so well but better than no medication."  AR 567–68.

These statements, if accepted as true, establish that she experiences headache pain at least every other day lasting one to two hours or more which is partially but not entirely alleviated by medication.  Those statements are not work preclusive, nor do they support the notion that her headaches would require her to be off task 15 percent of a work day in order for her to lay in a dark room.  The RFC is not the least one can do while remaining pain free, but the most one can do despite one's limitations.  *See* 20 C.F.R. 404.1545.

Finally, Plaintiff cites her treating psychologist's opinion that her headaches were an exacerbating factor vis-à-vis her mental health impairments.  Plaintiff posits no theory as to how that exacerbation ought to have been brought to bear on the RFC in addition to, or in lieu of, the restrictions the ALJ included which limited Plaintiff to an environment no louder than a typical office or retail setting, with simple/routine tasks, only routine decision making, and only occasional

communication with others.

The ALJ did not ignore Plaintiff's headache impairment. To the extent the ALJ erred in not canvassing all pertinent records, not explicitly finding the headaches severe or non-severe, and not explaining why that finding was reached, there is no basis to find harmful error. The only restriction Plaintiff proposes is off task behavior in excess of customary tolerances due to her need to lay down in a dark room. As explained above, that restriction is not supported by the cited records.

### C.   Dr. Popper's Opinion

#### 1.   Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

 "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883. *See also*

20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate how the factors of supportability and consistency are considered. *Id.*

## 2.   Analysis

Plaintiff's treating psychologist, Dr. Popper, completed a mental residual functional capacity questionnaire on December 14, 2018. AR 972–74. He identified diagnoses of recurrent depressive disorder, post-traumatic stress disorder, and generalized anxiety disorder. AR 972. He opined her limitations began June 30, 2016. *Id.* He rated Plaintiff's functionality as to twenty mental abilities across four categories of work related functioning, including understanding and memory, concentration, social interaction, and adaptation. On a scale of category I (no performance preclusion) to category IV (precludes performance 15% or more of a workday), he selected category IV for all twenty mental abilities, which the VE testified would preclude all work. AR 972-74; 57. Dr. Popper also opined Plaintiff would be absent from work five or more days per month and be unable to complete an eight-hour workday five or more days per month due to her

impairments, which the VE also testified would preclude all work.  AR 973, 57.  Dr. Popper submitted two additional opinions with nearly identical content dated August 13, 2019 and March 17, 2020.  AR 975–77; 978–80.

The ALJ provided the following pertinent discussion at different points of the decision with respect to Plaintiff's mental status more generally and Dr. Popper's opinions specifically:

> *The evidence of record does not support evidence of significantly abnormal mental status examinations*, and the interactions with the claimant's primary care physician appeared to be within normal limits with no abnormalities on mental status noted. While the claimant alleges an inability to concentrate at all, she demonstrated the ability to pay attention and concentrate far longer than she alleged. In fact, she was able to pay attention, behave appropriately, remember recent and remote details, answer questions, follow directions, and persist throughout the approximately 40 minute long hearing, belying her assertions to the contrary (hearing testimony).
>
> . . .
>
> Regarding the claimant's mental health complaints, Mark Popper, Ph.D., of Healing Hope, assessed the claimant in 2016. Mental status examination revealed she was cooperative with normal speech. Her affect was tearful and blunt. Her mood was sad and depressed. She was disoriented to the date, had a poor memory, poor judgment and insight, tangential thoughts with ruminations, suicidal ideations were noted with low risk, in the claimant complained of auditory and visual hallucinations as well as paranoid distortions and persecutory delusions. Diagnoses included major depressive disorder with mood congruent psychotic features, recurrent episode, PTSD with dissociative symptoms and generalized anxiety disorder (Exhibits B2F/7-8; B9F). Further records of healing Hope through 2018 reveal recitation of the claimant's subjective complaints, with no objective mental status findings noted (Exhibit B16F). In 2019 and 2020, Dr. Popper notes the claimant presents is depressed, he had poor grooming on occasion, was tearful, and spoke slowly and softly (Exhibit B23F).
>
> . . .
>
> Mark Popper, Ph.D., submitted a questionnaire dated December 14, 2018 indicating he had been treating the claimant since June 30, 2016. He noted the claimant is precluded from performance of 15% or more of an 8-hour workday in all areas of mental functioning (Exhibit B20F). In August 2019 a similar form was completed noting the claimant had significant dysfunction in all areas of mental functioning, a language barrier, was illiterate, and would be likely to miss 5 or more days of work per month (Exhibit B21F). In questionnaire completed in March 2020 related duplicative information (Exhibit B22F). Dr. Popper also completed a more detailed questionnaire, noting the claimant was sad and tearful throughout sessions, exhibited poor short term and long-term memory, and presented with anxiety,

depression and PTSD. He noted a poor ability to sustain focused attention and follow directions. A low frustration tolerance, poor ability to adapt to changes, and being easily angered and consumed with thoughts of death was noted. Minimal response to medications was noted (Exhibit B26F). *These opinions are not objectively supported by his own treatment records, which do not reveal much in the way of any objective findings.* Additionally, interactions with the claimant's primary care physician Dr. Yang do not support this level of dysfunction. In addition, it is noted that the claimant was able to participate fully in the hearing, answer questions, follow directions, behave appropriately, and remember recent and remote details of her life.

. . .

*Notably, there are no mental status findings noted in Dr. Popper's records*, and primary care physician treatment notes reveal the claimant denied hallucinations and was treated with medications for her depression. Primary care physician notes reveal intact mental status findings, and the determination that the claimant is capable of performing simple repetitive type tasks and appropriately responding to changes in a work setting or supported as noted by Joshua D. Schwartz, Ph.D. (Exhibit B16A; B17A). These opinions are found to be the most persuasive as they are based upon review of the evidence of record, and are supported by and consistent with the same. As noted above, radiographic findings are mild in nature and do not support the significant physical dysfunction the claimant alleges. In addition, there is no objective support for a disabling level of mental dysfunction.

AR 18, 20, 22–23 (emphasis added).

The decision contains three assertions regarding Dr. Popper's records, and the medical record more generally, as italicized above: 1) there is no evidence of significantly abnormal mental status examinations, 2) Dr. Popper's opinions are not supported by his own treatment records which do not contain much in the way of objective findings, and 3) there are no mental status findings in Dr. Popper's records. These assertions are not factually accurate.

Dr. Popper conducted two comprehensive mental status examinations (MSEs) in 2016 containing objective findings. As cited by the ALJ, those MSEs are located at exhibit B2F pages 7-8, and exhibit B9F. AR 668–70; 738–40. They both noted a select few normal findings including appearance, behavior and speech within cultural norms, cooperative relatedness with the examiner, and no homicidal ideation. In every other respect the findings were abnormal, including: tearful affect; sad/depress mood; disorientation; poor immediate and short term recall; poor recent and

remote memory; poor abstraction; poor interpretation; poor judgment; poor insight; auditory, visual, and olfactory hallucinations; paranoid distortions; depersonalization, derealization, persecutory, and somatic delusions; tangential though flow; preoccupied and ruminative thought content; suicidal ideation with low risk. *Id.*

Considering that both of Dr. Popper's comprehensive MSEs noted abnormalities in nearly every respect, those objective findings tend to support Dr. Popper's opinion that Plaintiff had work-preclusive limitations in every category of mental functioning. As quoted above however, the ALJ did cite Dr. Popper's 2016 MSEs at one point in the decision and accurately described a sampling of the objective findings therein. AR 20. Thus, it is unclear why the ALJ's decision contains assertions (as italicized above) about a purported lack of any objective support for significant mental deficits in the record generally, and about a purported lack of any mental status findings among Dr. Popper's records specifically. Those assertions can be refuted without looking beyond the content of the ALJ's own decision.

In addition to the two MSEs and three check-box mental RFC questionnaires, Dr. Popper also submitted progress notes from weekly sessions which, as the ALJ noted, predominately reported Plaintiff's subjective statements with no accompanying mental status examination. However, the fact that Dr. Popper did not perform a comprehensive MSE at each session does not undermine the evidentiary value of the comprehensive MSEs he did perform, as described above.

Finally, Dr. Popper submitted a "mental disorder questionnaire form" dated April 28, 2020. AR 1009–14. The form asks for narrative responses to various questions. The form asks the provider to give general observations, a recitation of the Plaintiff's subjective complaints, and a history of her mental disorder including family, social and environmental history. AR 1009–11. The form also contains a section labelled "current mental status" in which the provider is asked to describe Plaintiff's attitude/behavior, intellectual functioning/sensorium, affective status, and

reality contact.  Dr. Popper provided narrative responses noting objective deficiencies consistent with those he identified in the two MSEs described above.  AR 1011-1012.  Finally, the form asks the provider to describe current functioning, namely the extent to which the mental disorders interfere with: daily activities, social functioning, concentration and task completion, adaptation to work and work-stressors.  AR 1012-13.  He opined that Plaintiff's mental functioning was deficient in various respects, consistent with his opinions submitted in check-box format.

The ALJ described the form as an opinion unsupported by objective findings.  In fact, it is more of a hybrid between an opinion and a mental status examination.  Although it does not reflect the results of a specific mental status examination, it does ask the provider to describe "current mental status" and asks the provider to identify the date of the most recent visit.  Dr. Popper indicated the most recent visit was on April 24, 2020, four days prior to his completion of the form on April 28, 2020.  AR 1014.  In that sense, the form does serve as another example of objective mental status findings.  Moreover, it serves as a more recent example of the same, as the previous two MSEs were completed in 2016 at the very beginning of the treating relationship.

In sum, contrary to the ALJ's assertions, Dr. Popper identified ample objective findings in the form of the two MSEs from 2016, and the "current mental status" narrative summary reflected in the form dated April 28, 2020.  AR 668–70; 738–40; 1011–12.  The objective findings were consistent across those three documents (though the third did not cover as much ground), and they appear to provide reasonable support for the conclusions in Dr. Popper's check-box RFC forms identifying work-preclusive mental limitations in all areas of functioning.  AR 972–80.

As to the supportability and consistency of Dr. Popper's opinions in light of other evidence in the record, the ALJ provided two reasons for rejecting the opinions.  First, the ALJ found the opinions inconsistent with the visit notes from Plaintiff's primary care physician Dr. Yang during which Plaintiff's mental status "appeared to be within normal limits with no abnormalities on

mental status noted." AR 18.  The ALJ cited an August 22, 2017 examination with Dr. Yang in which Plaintiff was oriented times three, denied hallucinations, denied hearing voices, and denied suicidal ideation.  Exhibit B12F at 7-10, AR 831–34.  The ALJ also cited a March 2018 examination with Dr. Yang during which "she denied hearing voices and noted anxiety that someone was following her."  AR 20 (citing AR 849).  That examination also noted that she feels someone is always with her but when she looks nobody is there.  *Id.*  Plaintiff was referred to mental health treatment elsewhere.  *Id.*

She visited Dr. Yang again numerous times throughout 2018 and 2019 for various issues with no mental status findings noted other than orientation times three.  Defendant cites additional examinations purportedly noting only moderate depression, yet the cited pages reflect a different diagnosis, namely, "Major depression moderate recurrent with psychosis."  AR 1025, 1027, 1030, 1034, 1038, 1042.

In short, as a primary care provider evaluating Plaintiff for a variety of different conditions besides mental health, Dr. Yang provided two abridged mental status examinations in August 2017 and March 2018 which noted full orientation, denial of suicidal ideation and denial of hallucinations.  Dr. Yang then referred her elsewhere for mental health, and her remaining visits with Dr. Yang noted no mental status findings beyond alert and oriented times three.

Orientation, suicidal ideation, and hallucinations were the only matters Dr. Yang's MSEs addressed.   In those respects, Dr. Yang's MSEs differed from Dr. Popper's MSEs.  Dr. Popper performed comprehensive MSEs addressing various other mental status issues including affect; mood; immediate and short term recall; recent and remote memory; abstraction; interpretation; judgment; insight; distortions; delusions; thought flow; and thought content.  Dr. Yang's records did not undermine Dr. Popper's as to the myriad issues that Dr. Yang's records did not address.

As to the consistency of Dr. Popper's findings with other psychiatric examinations in the

record, the two psychiatric consultative examinations contained findings of note.  Dr. Yadegar examined Plaintiff on April 2, 2017.   Her appearance was well groomed and dressed despite red marks and bruises on her neck for which she was taking medication.  AR 688.  As to attitude and behavior she was polite, respectful and concise but made no eye contact.  *Id.*  Her thought process was linear, focused and goal directed.  *Id.*  She reported hearing voices calling her name two to three times a day and "sometimes see the person who tried to bite her finger."  *Id.*  She was fully oriented.  *Id.*  As to memory, she could not spell any words forward or backward because she had not been in school.  AR 689.  She knew her birthday.  *Id.*  She knew the year and month but not the day.  *Id.*  She did not know her address or phone number.  She could remember 2 out of 3 words after 5 minutes.  She could not perform serial 7s or 5s.  Concentration was an area of concern.  She was not persistent or assertive, and not able to speak up or advocate.  She could not interpret a proverb.  She knew an orange and banana were both fruit but could not identify their differences.  Her judgment was impaired.  *Id.*  Dr. Yadegar identified mild or moderate limitations in work related functioning.

On June 9, 2018 Dr. Michiel performed a consultative psychiatric examination.  AR 899.  Plaintiff was fairly groomed, had fair eye contact, normal speech.  Her mood was depressed and affect was restricted.  She was partially oriented.  She could repeat a simple math question.  She did not know the president.  She did not know what she would do if there was a fire.  She remembered what she had for dinner and remembered moving to Fresno from Colorado in 2016.  She could not remember when she came to the U.S..  She knew she had seven children but not their ages.  Dr. Michiel opined Plaintiff could not carry out complex instructions but otherwise had no work related limitations.

Dr. Yadegar and Dr. Michiel's examinations contained a mix of normal and abnormal findings.  Though their opinions were more tempered than that of Dr. Popper and used different

language, their examination findings overlapped to some extent.   As for the sparse mental examination findings of Dr. Yang (which the ALJ relied upon to discount Dr. Popper's opinion), those findings were all undermined to some extent by one of the three examining psychologists, including as to full orientation (undermined by Drs. Popper and Michiel), no reported hallucinations (undermined by Drs. Popper and Yadegar), and no suicidal ideation (undermined by Dr. Popper).

Finally, the ALJ found Dr. Popper's opinion inconsistent with Plaintiff's presentation at the hearing in which Plaintiff was able to "pay attention, behave appropriately, remember recent and remote details, answer questions, follow directions, and persist throughout the approximately 40 minute long hearing."  AR 18.  The ALJ cited "hearing testimony" generally to support that conclusion without specifics.  In any event, although the ALJ's personal assessment of Plaintiff at the hearing is not entirely irrelevant, it is not a substitute for comprehensive clinical mental status examinations.   Nor were Dr. Yang's two abridged mental status findings at primary care appointments a substitute. Thus, the ALJ's reasoning for rejecting Dr. Popper's opinions was inadequate.

### D.   Dr. Yadegar's Opinion

Dr. Yadegar examined Plaintiff on April 2, 2017 as described above, noting some normal findings on examination and some deficiencies.  AR 687–89.  Dr. Yadegar opined that Plaintiff was mildly impaired in her ability to perform simple and routine tasks, mildly impairment in her ability to accept instruction from supervisors, and mildly impaired in social interaction. AR 689.  Dr. Yadegar opined Plaintiff was moderately impaired in her ability to perform work on a consistent basis without special or additional instruction, moderately impaired in her ability to maintain attendance and complete a normal workday/week without interruption from a psychiatric condition, and moderately impaired in her ability to deal with the stress encountered in a workplace.  *Id.*

Plaintiff argues the ALJ erred in purporting to find the opinion "generally persuasive" and

consistent with the record, yet failing to include all the moderate limitations in the RFC.  Defendant responds that moderate limitations need not be incorporated as they are not work preclusive based on case law and the agency's definition of the word moderate as "more than a slight limitation in this area but the individual is still able to function satisfactorily."[4]  Neither contention is on all fours with the prevailing case law in this circuit.

"Where the ALJ accepts the medical assessment of moderate limitations, those limitations must be accounted for in the RFC."  *Wascovich v. Saul*, 2:18-CV-659-EFB, 2019 WL 4572084, at *4 (E.D. Cal. Sept. 20, 2019) (citing *Betts v. Colvin*, 531 F. App'x 799, 800 (9th Cir. 2013).

"This does not necessarily mean that the ALJ was required to explicitly transcribe the limitation in the RFC.  Rather, he is required to account for it in his 'translation.'"  *Wascovich*, 2019 WL 4572084 at *5;  *Rounds v. Commissioner of Social Security Administration*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC.").

Courts have occasionally relied on the Ninth Circuit's opinion in *Stubbs-Danielson* for the proposition that a limitation to simple and routine tasks can serve as a catchall for moderate mental limitations insofar as *Stubbs* held that an ALJ appropriate translated "pace and the other mental limitations regarding attention, concentration, and adaption" into "the only concrete restrictions available to him," namely a limitation to simple tasks.  *Stubbs–Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008).

---

[4] Resp. at 14-15 (citing HALLEX (Hearings Appeals and Litigation Law Manual) I-2-5-20, referencing Form HA-1152-U3 (Medical Source Statement of Case 1:21-cv-00134-GSA Document 17 Filed 01/21/22 Page 14 of 16 Ability to do Work-related Activities (Mental) (emphasis added)); *see also e.g., Rose M. E. v. Saul*, 2021 WL 1612091, at *3 (C.D. Cal. Apr. 26, 2021) ("SSA defines a 'moderate' limitation to mean '[t]here is more than a slight limitation in this area, but the individual can still function satisfactorily.'", *citing Fergerson v. Berryhill*, 2017 WL 5054690, at *3 (C.D. Cal. Nov. 1, 2017) (same) and *Cantu v. Colvin*, 2015 WL 1062101, at *2–3 (N.D. Cal. Mar. 10, 2015) (same); *Stenson v. Astrue*, 2012 WL 1154400, *8 (S.D. Cal. 2012) (same); see also *McLain v. Astrue*, 2011 WL 2174895, *6 (C.D. Cal. 2011) ("[m]oderate mental functional limitations . . . are not per se disabling, nor do they preclude the performance of jobs that involve simple, repetitive tasks").

Other courts have distinguished the limitations at issue in *Stubbs* from those at issue here. The case law in this circuit is split but tends to favor the view that a restriction to simple/routine tasks is not a catchall and does not account for all moderate limitations. *See Macias v. Saul*, No. 1:19-CV-01187-BAM, 2021 WL 856423, at *6 (E.D. Cal. Mar. 8, 2021) (collecting cases, and holding that a limitation to simple/routine tasks does not account for moderate limitations in maintain attendance and completing an 8-hour workday); (*Wascovich*, 2019 WL 4572084 at *5 (E.D. Cal. Sept. 20, 2019) (simple and routine task limitation does not account for moderate limitations in maintaining attendance); *Donna M. v. Saul*, No. 19-CV-03134-DMR, 2020 WL 6415601, at *4 (N.D. Cal. Nov. 2, 2020) (noting limitation to simple, routine tasks with no public interaction in RFC failed to address other moderate limitations, such as plaintiff's ability to relate to and interact with coworkers, associate with day-to-day work activity, maintain regular attendance in the workplace, and perform work activities on a consistent basis without special or additional supervision); *Sahyoun v. Saul*, No. 2:18-CV-576-EFB, 2020 WL 1492661, at *4 (E.D. Cal. Mar. 27, 2020) (rejecting argument that RFC determination that plaintiff could sustain work involving simple, repetitive tasks adequately captured moderate limitations in maintaining regular attendance, completing a normal workday or work week without interruption from a psychiatric condition, and handling normal work-related stress); *Christopher G. v. Saul*, No. 2:19-CV-06150-AFM, 2020 WL 2079972, at *6 (C.D. Cal. Apr. 30, 2020); *Flores v. Saul*, No. 1:18-CV-01523-SKO, 2020 WL 509098, at *5 (E.D. Cal. Jan. 31, 2020); *but see Messerli v. Berryhill*, No. 1:16–cv–00800–SKO, 2017 WL 3782986, at *11 (E.D. Cal. Aug. 31, 2017) (finding limitation to "simple repetitive tasks" accounted for moderate limitations in ability to accept instructions, interact with coworkers and the public, maintain attendance, complete a normal workday/workweek without interruptions, and moderate to serious limitations in her ability to deal with work stress); *Calisti v. Colvin*, 2015 WL 7428724, at * 7 (E.D. Cal. Nov. 23, 2015); *Schmidt v. Colvin*, No. 2:12-cv-00016-KJN, 2013 WL

5372845, at *17 (E.D. Cal. Sept. 25, 2013).

Here, the ALJ included in the RFC a limitation to simple and routine tasks as well as a limitation that Plaintiff could work in an environment no louder than a typical office, could not communicate with others more than occasionally, and could engage in only routine work related decision making.   AR 18.

Returning to the moderate limitations in Dr. Yadegar's opinion, Dr. Yadegar first opined that Plaintiff was moderately impaired in her ability to perform work on a consistent basis without special or additional instruction from supervisors. Yet Dr. Yadegar also opined she was only mildly limited as to her ability to perform simple and routine tasks, and mildly limited as to her ability to accept instruction from supervisors.  To the extent the special/additional instruction limitation was intended to apply to simple and routine tasks, Dr. Yadegar's opinion is internally inconsistent.  To the extent that limitation was intended to apply to detailed or complex task, the limitation is moot given that the ALJ limited Plaintiff to simple and routine tasks.  As such, her ability to perform detailed or complex tasks (with or without special instruction) is not relevant.

Second, Dr. Yadegar opined Plaintiff was moderately limited in her ability to maintain attendance and complete a normal workday/workweek without interruptions from a psychiatric condition. These limitations do not lend themselves to qualitative descriptions.  The mental residual functional capacity questionaries completed by Dr. Popper, for example, ask the clinician to identify the number of days per month the claimant would be absent due to mental impairments, along with the number of days she would be unable to complete a normal workday due to mental impairments.  AR 973-79.  Dr. Popper checked the box corresponding to five or more days in response to each question.  The VE testified that two such days would be work preclusive.  AR 57. The forms completed by Dr. Popper are the common format for submission of treating clinician's opinions.  The consultative examiners, by contrast, almost exclusively opine in narrative format.  It

is simply not clear how much absenteeism or off-task behavior Dr. Yadegar envisioned when using the word "moderate," or whether that unspecified level of absenteeism and off-task behavior would exceed customary tolerances in the workplace.  Plaintiff posits no theory as to how those limitations should be translated into concrete RFC restrictions.

Third, Dr. Yadegar opined Plaintiff was moderately limited in her ability to handle work related stressors.  Although there is no controlling authority directly on point, and the caselaw cited above tends to refute the notion that a limitation to simple/routine tasks is all encompassing, there is some case law supporting the notion that a limitation to simple routine tasks at least encompasses low stress tolerance.  *See, e.g.*, *Henry v. Colvin*, No. 1:15-cv-00100-JLT, 2016 WL 164956, at *18 (E.D. Cal. Jan. 14, 2016) (simple tasks encompasses low stress tolerance); *Keller v. Colvin*, No. 2:13-cv-0221-CKD, 2014 WL 130493, at *3 (E.D. Cal. Jan. 13, 2014) (simple, repetitive tasks "appropriately captured" physician's opinion that claimant required "low stress settings")).

In any case, the ALJ included concrete restrictions here beyond simple/routine tasks, namely no work in an environment louder than a typical office, only occasional social interaction, and only routine work related decision making.  Although these do not explicitly capture the concept of stress tolerance, an ALJ need not "explicitly transcribe [each] limitation in the RFC," provided he "account[s] for it in his 'translation.'"  *Wascovich*, 2019 WL 4572084 at *5;  *Rounds v. Commissioner of Social Security Administration*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC.").

Absent any legal authority to the contrary, or a practical guidance on how such a limitation ought to be incorporated (which Plaintiff does not identify, and of which the Court is not aware), there is no basis here to find that the ALJ's translation of the stress limitation was inadequate.

Finally, Plaintiff contends the ALJ failed to account for Dr. Yadegar's opinion that Plaintiff was limited to one-step commands and could not advocate for herself.  Plaintiff contends the one-

step command limitation would be dispositive here if incorporated into the RFC insofar as it would limit her to jobs with a reasoning level of R1, while the jobs identified by the VE all had a reasoning level of R2.  However, Dr. Yadegar did not so opine.  Under the section header labelled "Mental Status Examination," Dr. Yadegar identified next to "concentration" that concentration was an area of concern, and that "She was *able to complete [a] one-step command*."  AR 689 (emphasis added).  Plaintiffs assumes without support or explanation that Dr. Yadegar was implying a one-step command was all Plaintiff could perform.  Moreover, the quoted statement was located in the examination findings sections, not in the functional assessment section.  The location within the document strongly suggests that one-step commands was not a component of Dr. Yadegar's functional opinion.

The statement about Plaintiff's inability to advocate for herself was also listed under the examination findings section, not the functional assessment section.  *Id.*  Moreover, Plaintiff posits no theory on how the advocacy limitation (if it was intended as such) could be incorporated into a concrete limitation in the RFC.  Ostensibly, the ALJ could have simply stated "no jobs requiring self-advocacy," though it seems unlikely this would preclude past relevant work as an industrial cleaner, or the representative jobs available in the national economy including hand packager, "cleaner housekeeping," and assembler.

## VI.   Conclusion and Remand for Further Proceedings

Neither the February 17, 2021 favorable disability determination based on listing level hearing loss, nor the evidence upon which that determination was founded (the August 11, 2021 audiogram), are new and material evidence presenting a reasonable possibility that the outcome of the prior decision would have changed.  Moreover, the ALJ committed no reversible error with respect to Plaintiff's headache impairment.  Nor did the ALJ err with respect to Dr. Yadegar's consultative opinion.  The ALJ did, however, commit harmful error with respect to Dr. Popper's

opinions in that the ALJ's reasoning for rejecting the same was inadequate.  Neither Dr. Yang's sparse mental status findings during two primary care visits, nor the ALJ's personal observations of Plaintiff's disposition at the administrative hearing, constitute substantial evidence supporting a non-disability finding, nor do they justify rejection of Dr. Popper's opinions.

Remand is appropriate for the ALJ to specifically consider all relevant objective findings identified by Dr. Popper, including his two 2016 mental status examinations, the questionnaire he completed on April 28, 2020, any relevant information in his progress notes, the mental status examinations performed by the two consultative psychologists Drs. Michiel and Yadegar, Plaintiff's subjective testimony concerning her mental health impairments, any other relevant evidence of record, and reach a well-reasoned conclusion whether Dr. Popper's opinions, or any portion thereof, is supported.   *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

**VII.   Order**

For the reasons stated above, the Court finds that substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled.  Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is granted.  The Clerk of Court is directed to enter judgment in favor Plaintiff Ai Xiong, and against Defendant Kilolo Kijakazi, acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __June 11, 2022__                    _____ **/s/ Gary S. Austin**

UNITED STATES MAGISTRATE JUDGE

26